UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CHERYL LEE MONTS,              )
          Plaintiff           )
                              )
          v.                   )    C.A. No. 10-cv-30189-MAP
                              )
MICHAEL J. ASTRUE,             )
Commissioner, Social          )
Security Administration,      )
          Defendant           )


MEMORANDUM AND ORDER REGARDING
PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
DEFENDANT'S MOTION AFFIRMING DECISION OF COMMISSIONER
(Dkt. Nos. 8 & 11)

June 15, 2011

PONSOR, D.J.

I. INTRODUCTION

    This action seeks review of a final decision of the

Commissioner of Social Security ("Commissioner") denying

Plaintiff's applications for disability insurance benefits

("DIB") and Supplemental Security Income ("SSI").  Plaintiff

applied for DIB and SSI on October 4, 2007, alleging

disability due to Graves' disease, difficulty bending and

lifting, a thyroid problem, and mood swings.  (A.R. 167-78,

195.)

Plaintiff's claim was denied initially on December 27, 2007, and again on appeal on November 11, 2008. (A.R. 56-69.)  On March 4, 2010, Plaintiff appeared for a hearing before an administrative law judge ("ALJ"), who denied her claim on April 19, 2010. (A.R. 7-16.)  The Decision Review Board did not complete review of the ALJ's decision within the allotted time, rendering the ALJ's decision final and subject to judicial review. (A.R. 1-3.)

Plaintiff now moves for judgment on the pleadings (Dkt. No. 8), and Defendant moves for an order affirming the decision of the Commissioner (Dkt. No. 11).  For the reasons stated below, Plaintiff's motion will be denied, and Defendant's motion will be allowed.

## II. FACTS

### A.  Personal Life and Work Experience.

Plaintiff alleges that she has been disabled since July 31, 2005. (A.R. 168, 175.)  Plaintiff, who was forty-eight years old at the time of the alleged onset of disability, graduated from high school and had training in office work and as a nurse's aide. (A.R. 25-26, 201.)  She previously worked as an administrative assistant, a grill cook, and a

nurse's aide. (A.R. 26-27, 196.)

B.   Medical History.[1]

1.   Physical Ailments.

Plaintiff testified that she first had problems with her thyroid approximately fifteen to twenty years ago, stating that she had a goiter and suffered from hyperthyroidism. (A.R. 31.)  At that time, Plaintiff reportedly presented with symptoms typical of Graves' disease, including exophthalmos and proptosis.[2]  (A.R. 512.) Surgical removal of the goiter induced hyperthyroidism. (A.R. 31, 337, 389.)

Plaintiff's hyperthyroidism was treated over the years with levothyroxine.  (A.R. 334, 337.)  Plaintiff did not always take her prescribed medication, reporting on several

---

[1] Although the ALJ found that Plaintiff had the severe impairments of hyperthyroidism, pancreatitis, low back pain (mild degenerative changes), anemia, depression, and alcohol abuse, Plaintiff's arguments on appeal focus solely on her mental impairment and her thyroid condition. Therefore, the court will limit its recitation of the facts to the evidence relating to those impairments.

[2] Graves' disease is an organ-specific autoimmune disease of the thyroid gland.  Stedman's Medical Dictionary 515 (27th ed. 2000).  Exophthalmus and proptosis refer to the protrusion of one or both eyeballs.  Id. at 631, 1459.

3

occasions that she had not taken her thyroid medication for prolonged periods, including at least three separate periods of up to two months.  (A.R. 256-57, 324, 395, 398, 520.)

On November 12, 2007, Geraldine Kennedy, R.N., completed an endocrine disorder questionnaire regarding Plaintiff.  She could not assess the degree of control of the thyroid condition with therapy because Plaintiff had not been compliant with a request for follow-up testing.  (A.R. 464.)  Ms. Kennedy said that Plaintiff's prognosis was "[e]xcellent if she takes her medication as prescribed and goes for follow-up lab testing."  (A.R. 464.)

In March 2009, Dr. Sabyasachi Sen evaluated Plaintiff's thyroid condition.  Plaintiff reported chronic fatigue, feeling cold, heavy menstrual periods, anemia, and hair loss.  (A.R. 512.)  Dr. Sen noted that proptosis was "still present to a lesser extent."  (A.R. 512.)  Dr. Sen referred Plaintiff for blood testing and suggested that she maintain her current medication. (A.R. 512-13.)

C. Mental Impairment.

Plaintiff had an initial mental health evaluation at Gandara Mental Health Center on October 18, 2007.  (A.R.

449-53.) She told Paula Tucker, a licensed clinical social worker, that she felt like she was "in a rut" and needed help coping with her problems. (A.R. 449.) Plaintiff said this was her first time seeking mental health treatment. (A.R. 450, 453.) She complained of frequent crying, a desire to isolate herself from others, and changes in her dietary habits. (A.R. 449.) She said she consumed alcohol "socially," smoked cigarettes daily, and had used crack cocaine on a daily basis from age twenty-five until she quit five years previously. (A.R. 449.) Plaintiff reported suffering emotional and physical abuse by her alcoholic boyfriend. (A.R. 450-451). She also reported auditory and visual hallucinations, insomnia, forgetfulness, loss of impulse control, and depression. (A.R. 452.)

Nonetheless, Ms. Tucker observed that Plaintiff was well spoken and oriented with clear speech and logical thought processes. (A.R. 453.) She also noted that although Plaintiff appeared "guarded," her insight and judgment were fair. (A.R. 452.) Ms. Tucker diagnosed major depressive disorder, hyperthyroidism, anemia, isolation, "conflictual relationship," and low self-esteem. (A.R.

453.) She assigned Plaintiff a Global Assessment of
Functioning ("GAF") score of 52, which indicates moderate
symptoms or difficulties in social, occupational, or school
functioning.[3] (A.R. 453.)

On November 5, 2007, Plaintiff met with Dr. Mary
Barkalow at the Gandara Mental Health Center. Plaintiff
presented with complaints of insomnia and depression. (A.R.
460.) Plaintiff reported feeling sad and depressed with low
energy levels and body aches. (A.R. 459.) Dr. Barkalow
observed Plaintiff to be articulate, with fair insight and
judgment and no hallucinations or delusions. (A.R. 459.)
She suggested that Plaintiff's depression "appears to be
related to current physiological conditions, in addition to
conflictual relationship [with an] alcoholic boyfriend."
(A.R. 460.) Ultimately, Dr. Barkalow concluded that

---

[3] The GAF Scale is used for reporting a clinician's
judgment of the individual's overall level of psychological,
social, and occupational functioning and, unless otherwise
noted, refers to the level of functioning at the time of
evaluation. See American Psychiatric Ass'n, Diagnostic and
Statistical Manual of Mental Disorders 32-33 (4th ed., text
rev. 2000) (hereinafter "DSM-IV"). GAF scores in the 51-60
range indicate "[m]oderate symptoms (e.g., flat affect and
circumstantial speech, occasional panic attacks) OR moderate
difficulty in social, occupational, or school functioning
(e.g., few friends, conflicts with peers or co-workers)."
DSM-IV 34.

Plaintiff's symptoms were consistent with major depressive disorder and prescribed Wellbutrin. (A.R. 460.)

Dr. Barkalow continued to treat Plaintiff pharmacologically from November 2007 through at least March 2009, adjusting the Wellbutrin and adding Seroquel to the prescribed medications. (A.R. 461-62.) With the exception of Ms. Tucker's initial evaluation and the medication order sheets completed by Dr. Barkalow, there are no treatment notes in the record.

On December 21, 2007, Dr. Martin Markey conducted a consultative psychological examination of Plaintiff. (A.R. 499-502.) Plaintiff complained of Graves' disease, low energy, and depression, stating that she could not work because it "bother[ed] her to be around people." (A.R. 499-500). Plaintiff told Dr. Markey that she lived with a friend but had become more socially isolated in recent years. (A.R. 500-01.) When asked a series of simple questions designed to test her cognitive functions, Plaintiff responded appropriately and correctly. (A.R. 501.) Dr. Markey observed her to be lacking energy and enthusiasm and diagnosed her with major depressive disorder

without psychosis. (A.R. 501.) He assigned Plaintiff a GAF score of 50, which suggests serious symptoms. <u>See</u> DSM-IV 32. (A.R. 502.)

D. <u>RFC Assessments</u>.

1. <u>Physical RFC</u>.

In December 2007, Dr. Malin Weeratne, a state agency physician, assessed Plaintiff's physical residual functional capacity ("RFC") based on his review of the record. (A.R. 491-98). Dr. Weeratne opined that Plaintiff could lift and carry ten pounds frequently and twenty pounds occasionally, and sit, stand, and/or walk for about six hours in an eight-hour workday. (A.R. 492.) He did not find any postural or manipulative limitations but advised that Plaintiff should avoid concentrated exposure to extreme cold and hazards. (A.R. 493-95.)

2. <u>Mental RFC</u>.

Dr. Ginette Langer, a state agency psychological consultant, also reviewed the evidence of record in December 2007 and offered an opinion as to Plaintiff's mental RFC. (A.R. 487-90.) Dr. Langer suggested that Plaintiff was moderately limited in her abilities to understand, remember, and carry out detailed instructions and maintain attention and concentration for extended periods. (A.R. 487.) Dr. Langer also assessed moderate limitations in Plaintiff's

ability to interact with the general public and get along with co-workers. (A.R. 488.) Dr. Langer concluded that Plaintiff could understand and remember simple instructions, concentrate and maintain attention for at least two hours at a time, and be socially appropriate. (A.R. 489.)

On March 17, 2009, Dr. Barkalow completed a mental RFC questionnaire. (A.R. 505-09.) Dr. Barkalow said she had been treating Plaintiff since October 2007 for a major, moderate, and recurrent depressive disorder. (A.R. 509.) She assigned a GAF score of 57, which corresponds to moderate symptoms. DSM-IV 32. Dr. Barkalow described Plaintiff's treatment as anger management, stress management, developing communication and coping skills, and building self-esteem. A mental status examination showed Plaintiff to be alert and oriented without suicidal or homicidal ideation or psychosis. Dr. Barkalow noted Plaintiff's reports of auditory and visual hallucinations, variable appetite, insomnia, poor impulse control, and memory problems. She noted that Plaintiff's behavior was guarded, her insight and judgment were fair, her thought processes were logical, her speech was clear, and her mood was depressed and anxious. (A.R. 509.)

Dr. Barkalow also assessed Plaintiff's limitations relating to her mental ability to perform unskilled work.

Dr. Barkalow concluded that Plaintiff had either a very good or a satisfactory ability to remember work-like procedures; understand, remember, and carry out short and simple as well as detailed instructions; maintain attention and concentration for two-hour segments; sustain an ordinary routine without special supervision; and accept instructions and respond appropriately to criticism from supervisors. (A.R. 507-08.)

Nonetheless, Dr. Barkalow determined that Plaintiff was seriously limited, though not precluded, in her abilities to maintain regular attendance and be punctual; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychological symptoms; ask simple questions or request assistance; respond appropriately to changes in a routine work setting; and deal with the stress of semi-skilled or skilled work.  (A.R. 507-08.)  Finally, she concluded that Plaintiff was severely limited or entirely unable to work with or in close proximity to others without being unduly distracted; perform at a consistent pace without an unreasonable number of rest periods; maintain socially appropriate behavior; deal with normal work stress; or interact appropriately with the general public.  (A.R. 507-08.)  Consequently, she estimated that Plaintiff would be absent from work more than four days

10

each month due to her impairment.  (A.R. 509.)

E.   Testimony at the Administrative Hearing.

    1.   Plaintiff's Testimony.

As for her hyperthyroidism, Plaintiff explained that "it makes me want to eat but I don't eat" and stated "everything is slow."  (A.R. 31.)  As for her mental status, Plaintiff testified that she avoids public transportation because crowds of people make her paranoid and anxious.  (A.R. 28.)  She stated that she was taking eleven or twelve pills daily to deal with her depression and that she experiences side effects such as drowsiness, dizziness, and sleepiness.  (A.R. 28.)

With respect to her daily routine, Plaintiff testified that she takes naps on a daily basis ranging from forty-five minutes to two hours.  (A.R. 32.)  She noted that her appetite is poor, she has little energy, and she sleeps for only two-to-three hours each night.  (A.R. 39.)  Plaintiff also stated that she suffers from panic attacks a couple of times each week.  (A.R. 36.)  Plaintiff testified that she stays in bed and watches television for most of the day while her boyfriend cooks meals and goes shopping.  (A.R. 37.)  Occasionally she accompanies him shopping and attends church.  (A.R. 37-38.)  She described herself as "totally disorganized" and dependent on her boyfriend to take care of

household chores and to remind her about her doctor's appointments.  (A.R. 38-39.)

    2.  <u>Medical Expert's Testimony</u>.

Dr. Gerald Koocher testified at the administrative hearing by telephone as a medical expert.  He stated that the GAF score assigned by Dr. Barkalow was in the mid-moderate range of impairment.  (A.R. 47.)  Dr. Koocher noted that Dr. Barkalow cited the presence of auditory and visual hallucinations, but Plaintiff denied auditory hallucinations at the hearing.  (A.R. 47.)  Dr. Koocher opined that the visual hallucinations indicated an eye problem or some other impairment rather than a hallucination.  (A.R. 47.)

Dr. Koocher noted that Plaintiff was not compliant with follow-up blood tests for hyperthyroidism and that low thyroid hormone levels contributed significantly to a depressed mood.  (A.R. 48.)  He noted Plaintiff's testimony regarding her impaired ability to engage in activities of daily living but added that such limitations were not documented in the record.  (A.R. 48.)

Dr. Koocher also discussed the functional limitations assessed by Dr. Barkalow, opining that the limitations were not accompanied by a sufficient explanatory narrative. (A.R. 48-49.)  Dr. Koocher concluded that Plaintiff suffered from a mental impairment -- depression -- but that the

impairment was moderate.  (A.R. 48.)

### 3.  Vocational Expert's Testimony.

The ALJ posed a hypothetical question to the vocational expert ("VE") asking whether jobs existed in the local or national economy that could be performed by an individual of Plaintiff's age and background, limited to light work; occasional climbing, stooping, bending, balancing, kneeling, and crawling; no heights or ladders; no hazards or dangerous machinery; no exposure to extreme cold; simple tasks requiring limited concentration; and limited to working with "things" rather than working with people.  (A.R. 51.)  The VE testified that the past relevant work (administrative clerk) could not be performed but that other work, including a hand packer, laundry sorter, and inserter, could be performed.

The ALJ posed a second hypothetical question assuming the above limitations and further assuming that the individual required frequent rest breaks due to fatigue and would miss work approximately four times per month.  (A.R. 52.)  The VE opined that such limitations would preclude the individual from performing any job.  (A.R. 52.)

## F.   The ALJ'S Findings.

At Step One of the disability adjudicative process, the
ALJ found that Plaintiff had not engaged in substantial
gainful activity since July 31, 2005, the date of onset of
her alleged disability.  (A.R. 9.)  At Step Two, the ALJ
found that Plaintiff had severe impairments of
hyperthyroidism, pancreatitis, low back pain (mild
degenerative changes), anemia, depression, and alcohol
abuse.   (A.R. 9.)  At Step Three, the ALJ determined that
Plaintiff's impairments did not meet or medically equal any
of the listed impairments.  (A.R. 11.)  At Step Four, the
ALJ found that Plaintiff retained the capacity to perform
light work limited to occasional climbing, stooping,
bending, balancing, kneeling, and crawling, and she would
need to avoid exposure to extreme cold.  (A.R. 12.)  In
addition, the ALJ limited Plaintiff to simple, routine
tasks, requiring limited concentration and focusing on
things rather than people.[4]  (A.R. 12.)

------

[4] "Light" work involves lifting no more than twenty
pounds at a time with frequent lifting or carrying of
objects weighing up to ten pounds.  20 C.F.R. §§
404.1567(b), 416.967(b).  A job also falls in this category
when it requires a good deal of walking or standing, or
involves sitting most of the time with some pushing or

While the ALJ found that Plaintiff could not perform her past relevant work, the ALJ concluded at Step Five that Plaintiff was not disabled because she retained the capacity to perform other work such as hand packer, laundry sorter, and inserter, all of which, according to the VE, exist in significant numbers in the national economy.  (A.R. 14-15.) In reaching this conclusion, the ALJ determined that Plaintiff's impairments could reasonably be expected to cause the alleged symptoms but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not generally credible and were entitled to little weight.  (A.R. 13.)  He also assessed greater weight to Dr. Koocher's opinion than to Dr. Barkalow's opinion.  (A.R. 14.)

### III. <u>DISCUSSION</u>

Plaintiff argues (1) that the ALJ did not give sufficient weight to the opinion of Dr. Mary Barkalow; and (2) that the ALJ's conclusion as to Plaintiff's physical RFC is not supported by substantial evidence.  For the reasons stated below, the court finds these arguments unpersuasive.

---

pulling of arm or leg controls, even though the weight lifted may be very little.  <u>Id.</u>

A.   Standard of Review.

Judicial review of a final decision of the Commissioner is limited to (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner applied the correct legal standards.  Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001).  The responsibility for weighing conflicting evidence and resolving issues of credibility belongs to the Commissioner and his designee, the ALJ.  See id. at 10.  The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence is such evidence "as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).  Accordingly, the court must affirm the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). This is true "even if the record arguably could justify a different conclusion."  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).

**B.    Whether the ALJ Gave Sufficient Weight to Dr.
        Barkalow's Opinion.**

A treating physician's opinion is entitled to
controlling weight only if it is "well-supported by
medically acceptable clinical and laboratory diagnostic
techniques and is not inconsistent with the other
substantial evidence in [the] record."  20 C.F.R. §
416.927(d); Social Security Ruling ("SSR") 96-2p.  If an
inconsistency exists between two opinions in the record, the
conflict is to be resolved by the Commissioner, not the
court.  Rodriguez v. Sec'y of Health and Human Servs., 647
F.2d 218, 222 (1st Cir. 1981).  If the opinion is not
entitled to controlling weight, its weight depends on
factors such as the length of the treatment relationship,
the nature and extent of the treatment, the degree to which
the opinion is supported by medical signs and laboratory
findings, the consistency of the opinion with the record as
a whole, and the specialty of the treating source.  20
C.F.R. §§ 404.1527(d)(2)-(5), 416.927(d)(2)-(5).

Here, the ALJ gave little weight to the opinion of Dr.
Barkalow, which Plaintiff contends was an error.  This court
disagrees.  The ALJ did not err by affording little weight

17

to Dr. Barkalow's opinion, because that opinion was inconsistent with the record as a whole.

Dr. Barkalow opined that Plaintiff was severely limited or entirely unable to perform the following functions: work with or in close proximity to others without being unduly distracted; perform at a consistent pace without an unreasonable number of rest periods; maintain socially appropriate behavior; deal with normal work stress; or interact appropriately with the general public. (A.R. 507-08.) She also estimated that Plaintiff would be absent from work more than four days each month due to her impairment. (A.R. 509.) As the VE noted, such limitations would preclude Plaintiff from all work. (A.R. 52.)

However, the observations made by Plaintiff's treating sources, including Dr. Barkalow herself, do not support such severe limitations. Between October 2007 and December 2007, Plaintiff met with licensed clinical social worker Paula Tucker, Dr. Barkalow, and Dr. Martin Markey. Each of these individuals noted that Plaintiff reported low energy levels, difficulty sleeping, changes in dietary habits, and feelings of depression, stemming in large part from her long-term relationship with an alcoholic boyfriend. (A.R. 453, 459, 501.) Yet, none, including Dr. Barkalow, reported that

Plaintiff's depression was impacting her cognitive functions.  In fact, they observed Plaintiff to be well spoken, oriented, logical, and exhibiting fair or good insight and judgment.  (A.R. 453, 459, 501.)  None indicated that Plaintiff was suicidal, was experiencing frequent panic attacks, or was exhibiting other symptoms that would render her disabled.  While her physicians noted Plaintiff's reports of becoming increasingly isolated, none observed anti-social, psychotic, or violent tendencies.[5]

Moreover, while she noted in her mental RFC questionnaire that Plaintiff reported hallucinations, Dr. Barkalow did not discuss these hallucinations in any detail, failing to identify their nature, severity, or frequency. At the administrative hearing, Plaintiff described these hallucinations as black shadows "on the sides of her face," which led Dr. Koocher to conclude that Plaintiff may be suffering from an eye problem rather than a hallucination. (A.R. 47.)

Dr. Barkalow's conclusions are also inconsistent with

---

[5] Although Plaintiff mentioned that she had gotten in several physical altercations in recent years, the record indicates that these episodes occurred primarily between Plaintiff and her alcoholic boyfriend.

the other RFC assessments provided in this case.  Dr.
Ginette Langer, a state agency psychological
consultant, assessed moderate limitations in Plaintiff's
ability to interact with the general public and get along
with co-workers.  (A.R. 488.)  She concluded that Plaintiff
could understand and remember simple instructions,
concentrate and maintain attention for at least two hours at
a time, and be socially appropriate.  (A.R. 489.)

Similarly, Dr. Koocher, who was the only doctor to
offer an opinion after hearing Plaintiff testify, observed
that the medical record did not support the limitations
claimed by Plaintiff.  (A.R. 48.)  Furthermore, Dr. Koocher
testified that Plaintiff's failure to follow her doctors'
recommendations was a major contributing factor to any
symptoms she was experiencing.  More to the point, he
explained that Plaintiff's noncompliance with follow-up
blood tests for hyperthyroidism was important to her
depression diagnosis "because low thyroid hormone levels
contribute significantly to depressed mood . . . ."  (A.R.
48.)  Even Dr. Barkalow noted that Plaintiff's depression
"appears to be related to [her] current physiological
conditions."  (A.R. 460.)

The above evidence, including both observations by Plaintiff's treating sources and RFC assessments by other physicians, run contrary to Dr. Barkalow's opinion. Thus, this court cannot say that the ALJ erred by affording little weight to that opinion.

C. <u>Whether the ALJ's Conclusion as to Plaintiff's RFC was Supported by Substantial Evidence</u>.

Plaintiff next argues that the limitations imposed by the ALJ in his findings as to Plaintiff's RFC were not supported by substantial evidence. Specifically, Plaintiff contends that the ALJ failed to consider Plaintiff's thyroid condition and its impact on her physical functioning capacity. Plaintiff notes that hyperthyroidism manifests in feelings of fatigue, which, according to Plaintiff, would result in chronic absenteeism and would preclude her from working. Accordingly, Plaintiff argues that the ALJ erred in constructing an RFC that did not properly account for such limitations.

There is sufficient evidence in the record indicating that the ALJ committed no such error. The ALJ specifically listed hyperthyroidism as a severe impairment suffered by Plaintiff. (A.R. 9.) Next, the ALJ noted that, in addition

to failing to arrange follow-up blood tests, Plaintiff also was not diligent in taking her thyroid medication. (A.R. 13.) Of course, this lack of diligence would augment all symptoms of hyperthyroidism, including both depression (as Dr. Koocher testified) and fatigue. As the Commissioner properly noted, an individual cannot be found disabled if she fails to follow prescribed treatment and offers no sufficient explanation. See 20 C.F.R. §§ 404.1530, 416.930 (instructing claimants to "follow treatment by your physician if this treatment can restore your ability to work. . . . If you do not follow the prescribed treatment, without a good reason, we will not find you disabled."); Tsarelka v. Sec'y of Health and Human Servs., 842 F.2d 529, 534 (1st Cir. 1988) (explaining that "implicit in a finding of disability is a determination that existing treatment alternatives would not restore a claimant's ability to work").

In this case, Plaintiff has offered no explanation for her failure to follow prescribed treatment for hyperthyroidism. Additionally, even if Plaintiff had offered such an explanation, the result would be the same.

The ALJ determined that Plaintiff's fatigue, whatever the cause, was not so severe as to render her disabled. As the court's recitation of the facts indicates, the medical record and the RFC assessments fully support this conclusion.[6] Therefore, the ALJ did not err in arriving at the RFC outlined above.

## IV. CONCLUSION

This case presents a familiar factual picture. Plaintiff, all agree, suffers serious impairments. Some medical evidence suggests these are totally disabling. Other evidence suggests the contrary. Although the court might, if it had decision-making authority under the law, side with the treating physician here, its job is only to see if substantial evidence supports Defendant's ultimate decision. Unfortunately for Plaintiff, the requisite substantial evidence exists in the record. Of course, this

---

[6] It is worth noting that Plaintiff's feelings of fatigue were considered not only by Dr. Weeratne (the only physician to provide a physical RFC assessment), but also by the other physicians offering opinions in this case. For instance, Dr. Langer's mental RFC assessment noted that Plaintiff's "allegations of low energy and difficulty with concentration [are] credible," but concluded that such symptoms did not significantly interfere with Plaintiff's ability to work. (A.R. 489.)

decision does not bar Plaintiff from reapplying for benefits if her condition worsens.

For the foregoing reasons, Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 8) is hereby DENIED, and Defendant's Motion to Affirm the Decision of the Commissioner (Dkt. No. 11) is hereby ALLOWED. The clerk will enter judgment for Defendant. The case may now be closed.

It is So Ordered.


                              /s/ Michael A. Ponsor
                              MICHAEL A. PONSOR
                              U. S. District Judge

24